UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Renato Acain, et al. | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:12-cv-00044 |
| | § | |
| | § | |
| | § | |
| International Plant Services, LLC, et al. | § | |
| | § | |
| | § | |
| | § | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiffs Renato Acain, Randy Agosto, Efren Aliviano, Wenefredo Andeza, Artemio Anzale, Greg Ba-ang, Jeffrey Batac, Dennis Bicera, Vergino Bolambot, Ferdinand Bellido, Anatalio Caang, Romeo Candilada, Arnel Castaneda, Lizezellito Cloribel, Leonilo Colina, Arturo Conclara, Elleser Cristobal, Ludovico Defacto, Jorge Denaque, Elmer Domingo, Simeon Domingo, Aaron Estrera, Felix Eduardo, Alfredo Farina, Carlito Fidel, Jaygen Genon, Felipe Gutib, Gabino Labadlabad, Edito Laurito, Allan Guillartes, Gilberto Lauriquez, Edgar Leonor, Camilo Lumagsao, Johnny Macaraig, Nicasio Mangilimotan, Ladislao Melgar, Benjamin Nague, Sergio Natad, Zosimo Olimba, Nilo Palamillo, Alejandro Pantalita, Eduardo Patupat, Bienvenido Peralta, Hermogenes Punzalan, Antonio Redoloza, Alfredo Rosales, Feliciano Santos, Alejandro Santizas, Giovanne Saramosing, Florentino Sayago, Felipe Siapno, Rosellier Somoza, Roy Talledo, Larry Urbano, Benjamin Villejo, Baltazar Villejo, Franklin Villareal, for their First Amended Complaint, allege as follows:

## I.    NATURE OF THE ACTION

This action arises from a scheme by International Plant Services, LLC, MBC Human Resources International, Inc., and its owners, Nourredine Ayed, Karim Ayed, Richard Dale Johnston and Nida Sarmiento, as well as Laysander Bustamonte, Adrian Toups and Adriane Wilson (the "Conspirators"), to engage in human trafficking inside and outside Texas to provide skilled foreign labor to companies in the oil and gas industry.

MBC, IPS, Nida Sarmiento, aided and abetted by Nourredine Ayed, tricked Plaintiffs into paying placement fees to MBC through false verbal representations and then forcing them to sign written contracts under duress and travel to the United States for what Plaintiffs were led to believe would be five (5) years of stable, if not permanent employment.  In fact, Plaintiffs were placed in a job pool and given temporary jobs whenever a job became available. Defendants then controlled the Plaintiffs by maintaining: (1) debt bondage through one sided verbal and/or written contracts with the Plaintiffs and other workers which IPS immediately broke on the workers' arrival in the United States; (2) provided one year, instead of five year contracts written in English to Plaintiffs instead of contracts written in their native language, did not provide a translation of the documents, did not explain the contracts and often required Plaintiffs to sign the contracts or lose their non-refundable placement fees; (3) verbally, and in writing promised to pay the workers $1,000 "with or without pay", but then required them to repay these amounts when they got work from IPS; (4) threatened the workers with being sent "home" to the Philippines if they complained about their lack of employment, debt bondage and being required to repay the $1,000 per month allowances; (5) confiscated, or attempted to confiscate their passports when they returned home to the Philippines and then required Plaintiffs to sign additional contracts as a precondition to return to the United States for work; (6) controlled Plaintiffs' right to leave their apartments during "standby" time, for which IPS refused to pay

them; (7) Defendants controlled every facet of Plaintiffs' life while on "stanby" from controlling when, or if Plaintiffs received their mail, entering their apartments with pass-keys to determine if Plaintiffs were present, and requiring them to attend meetings or drive vans for IPS—all without compensation or pay; (8) refused to pay workers unpaid salary on termination; (8) misled the workers by falsely claiming that Filipino law and agreements with the POEA forced IPS to forbid workers to work for anyone else who offered better working conditions; and (9) tampered with and/or retaliated against three key witnesses who gave testimony adverse or potentially adverse to IPS during state court litigation in *International Plant Services, LLC v. The AIM Group Incorporated, et. al.,* Case No. 2007- 65491, District Court of Harris County, Texas, 127th Judicial District.

On a parallel track of false promises, IPS, MBC, Richard Dale Johnston, Nida Sarmiento and the Ayeds misled the United States Consul, Republic of the Philippines to grant E-2 visas by false representations that the workers were "essential" to the company's operations and that there were specific jobs for each worker at specific wages and further represented that American workers with the same or similar skills were not available in the job market. In fact, many Plaintiffs were forced into a general labor pool, placed on "standby" status and were unemployed for lengthy periods of time.

Plaintiffs were extremely vulnerable to improper pressure and relied upon the misrepresentations regarding the working conditions offered by IPS in the United States. MBC and IPS used Plaintiffs' trust to submit E-2 visa applications to the United States Consul, which enabled the Conspirators to bring low cost skilled labor into the United States for a period of up to five years. IPS was required to disclose, under penalty of perjury, all facts material to Plaintiffs' employment. However, IPS intentionally obtained E-2 visas from the Consul promising the Consul that Plaintiffs would receive a *base salary* of at least $41,600 during the

up-to-five year period Plaintiffs worked in the United States. After obtaining the E-2 visas, MBC and IPS required Plaintiffs to sign contracts (written in English) that provided for an *hourly* rate and that purportedly paid workers on a "No-Work-No-Pay" basis. In truth and fact, many plaintiffs were paid far less than their base salary. IPS promised Plaintiffs they would be paid $1,000 "with or without pay" in addition to their hourly rate, but then deducted these amounts from their pay when they worked, placing many plaintiffs in debt to IPS. Plaintiffs' contracts with IPS are void and violate public policy to the extent that they violate the terms of employment represented to the United States government. Similarly, the contracts must be reformed to comport with the fraudulent promises made to Plaintiffs about the jobs and working conditions promised by IPS in obtaining their agreement to work for IPS in the United States.

Based on the above representations, Plaintiffs' reliance on IPS as a sponsor and employer, the absolute control imposed over Plaintiffs daily life, combined with submitting E-2 visa applications to sponsor and act of sponsoring each Plaintiff into the United States, IPS, MBC, Johnston, Sarmiento and the Ayeds undertook a fiduciary duty to Plaintiffs. Defendants breached their fiduciary duties of honesty and loyalty to Plaintiffs and, instead, exploited Plaintiffs for their own greed and personal gain.

All Plaintiffs suffered lost wages, consequential damages, and suffered mental anguish as a result of Defendants conduct—all in violation of Tex. Penal Code § 20A.01 *et. seq* and Texas common law as set out herein.

## II.   PARTIES

1.    Noureddine Ayed is a citizen of Tunis and maintains a residence at 30 Bayou Pointe Road, Houston, Texas, 77063 and can be served at that address. Noureddine Ayed is part owner and a director of International Plant Services, which is based in, and does business in Houston, Texas. Norredine Ayed is an agent, director and part owner of MBC and numerous

other companies whose level of involvement of the Enterprise is yet to be determined through discovery. IPS Ayed oversees, directs and controls overall operations of the Enterprise. On information and belief, Nourredine Ayed and Karim Ayed funded operations for MBC, own 25% of MBC, and control and direct the activities of Nida Sarmiento, and MBC. Nourredine Ayed regularly travelled to, and maintained residence in Texas while directing, controlling and supervising IPS management.

2.      Karim Ayed is a citizen of Tunis and maintains a residence at 30 Bayou Pointe Road, Houston, Texas, 77063 and can be served at that address. Karim Ayed is Vice President and part owner of IPS and other entities controlled and/or participating in the Enterprise. Karim Ayed and Norredine Ayed are sometimes referred to herein as the "Ayeds". Karim Ayed regularly travelled to, and maintained residence in Texas while directing, controlling and supervising IPS management.

3.      Nida Sarmiento is a citizen of the Republic of the Philippines and is the President of MBC Human Resources Development Corp. Ms. Sarmiento, through MBC Human Resources Development Corp. ("MBC") owns part of IPS and has, during relevant times, traveled to Houston to meet with other management of IPS to oversee the operations of the Enterprise and engage in tortious conduct, as described herein. Ms. Sarmiento's conduct was intended to, and did have a substantial, direct, and foreseeable effect in Texas. Ms. Sarmiento is therefore subject to the jurisdiction of this Court pursuant to the Texas Long-Arm Statute, C.P.R.C. §§17.041 et. seq.

4.      International Plant Services, LLC is a Texas limited liability company that maintains an office and can be served at 12603 Southwest Freeway, Stafford, Texas, 77477.

5.      MBC Human Resources Development Management Corp. ("MBC") is a foreign company that can be served at 4th Floor Eagle Bldg., No 2621 Alejo Aquino Street, Singalng,

5

Manila Philippines, Republic of the Philippines. MBC owned 70% of IPS and purposely availed itself of the privilege of doing business in Texas by acting as an agent for IPS, recruiting and procuring Filipino workers to be employed by IPS in the United States. Further, MBC has engaged in tortious conduct intended to cause harm in Texas and which gives rise to Plaintiffs' causes of action. MBC's conduct was intended to, and did have a substantial, direct, and foreseeable effect in Texas. Therefore, MBC is subject to the jurisdiction of this Court.

6.      Richard Dale Johnston was a resident of Harris County during all times relevant to this complaint, but has relocated to California. Richard Dale Johnston was President of International Plant Services.

7.      Laysander Bustamonte is an individual whose address is currently unknown.

8.      Adriane Wilson is an individual whose address is currently unknown.

9.      Adrian Toups is an individual whose address is currently unknown.

10.     Sue Mariner is an individual whose address is currently unknown.

11.     John Does 1-10 are persons whose identity or involvement in the acts described herein is presently unknown, but will be the subject of discovery in this case.

12.     Renato Acain is a citizen of the Republic of the Philippines and currently resides in Texas.

13.     Randy Agosto is a citizen of the Republic of the Philippines and currently resides in Texas.

14.     Efren Aliviano is a citizen of the Republic of the Philippines and currently resides in Texas.

15.     Wenefredo Andeza is a citizen of the Republic of the Philippines and currently resides in Texas.

16.     Artemio Anzale is originally from the Republic of the Philippines and entered the

United States on an E-2 visa and has since become a permanent resident of the United States. Mr. Anzale resides in Texas.

17.    Greg Ba-ang is a citizen of the Republic of the Philippines and currently resides in Texas.

18.    Jeffrey Batac is a citizen of the Republic of the Philippines and currently resides in Texas.

19.    Ferdinand Bellido is a citizen of the Republic of the Philippines and currently resides in Texas.

20.    Dennis Bicera is originally from the Republic of the Philippines and entered the United States on an E-2 visa and has since become a permanent resident of the United States. Mr. Bicera resides in Texas.

21.    Verginio Bolambot is a citizen of the Republic of the Philippines and currently resides in Texas.

22.    Anatalio Caang is a citizen of the Republic of the Philippines and currently resides in Texas.

23.    Romeo Candilada is a citizen of the Republic of the Philippines and currently resides in Texas.

24.    Arnel Castaneda is a citizen of the Republic of the Philippines and currently resides in Texas.

25.    Liezellito Cloribel is originally from the Republic of the Philippines and entered the United States on an E-2 visa and has since become a permanent resident of the United States. Mr. Cloribel resides in Texas.

26.    Leonilo Colina is a citizen of the Republic of the Philippines and currently resides in Texas.

27.     Arturo Conclara is a citizen of the Republic of the Philippines and currently resides in Texas.

28.     Elleser Cristobal is a citizen of the Republic of the Philippines and currently resides in Texas.

29.     Ludovico Defacto is a citizen of the Republic of the Philippines and currently resides in Texas.

30.     Jorge Denaque is a citizen of the Republic of the Philippines and currently resides in Texas.

31.     Elmer Domingo is a citizen of the Republic of the Philippines and currently resides in Texas.

32.     Simeon Domingo is a citizen of the Republic of the Philippines and currently resides in Texas.

33.     Aaron Estrera is a citizen of the Republic of the Philippines and currently resides in Texas.

34.     Felix Eduardo is a citizen of the Republic of the Philippines and currently resides in Texas.

35.     Alfredo Farina is a citizen of the Republic of the Philippines and currently resides in Texas.

36.     Carlito Fidel is originally from the Republic of the Philippines and entered the United States on an E-2 visa and has since become a permanent resident of the United States. Mr. Carlito resides in Texas.

37.     Jaygen Genon is a citizen of the Republic of the Philippines and currently resides in Texas.

38.     Felipe Gutib is a citizen of the Republic of the Philippines and currently resides in

Texas.

39.     Allan Guillartes is a citizen of the Republic of the Philippines and currently resides in Texas.

40.     Gabino Labadlabad is a citizen of the Republic of the Philippines and currently resides in Texas.

41.     Edito Laurito is a citizen of the Republic of the Philippines and currently resides in Texas.

42.     Gilberto Lauriquez is a citizen of the Republic of the Philippines and currently resides in Texas.

43.     Edgar Leonor is a citizen of the Republic of the Philippines and currently resides in Texas.

44.     Camilo Lumagsao is a citizen of the Republic of the Philippines and currently resides in Texas.

45.     Johnny Macaraig is a citizen of the Republic of the Philippines and currently resides in Texas.

46.     Nicasio Mangilimotan is a citizen of the Republic of the Philippines and currently resides in Texas.

47.     Ladislao Melgar is a citizen of the Republic of the Philippines and currently resides in Texas.

48.     Benjamin Nague is a citizen of the Republic of the Philippines and currently resides in Texas.

49.     Sergio Natad is a citizen of the Republic of the Philippines and currently resides in Texas.

50.     Zosimo Olimba is a citizen of the Republic of the Philippines and currently

resides in Texas.

51.      Nilo Palamillo is a citizen of the Republic of the Philippines and currently resides in Texas.

52.      Alejandro Pantalita is a citizen of the Republic of the Philippines and currently resides in Texas.

53.      Eduardo Patupat is a citizen of the Republic of the Philippines and currently resides in Texas.

54.      Bienvenido Peralta is a citizen of the Republic of the Philippines and currently resides in Texas.

55.      Hermogenes Punzalan is a citizen of the Republic of the Philippines and currently resides in Texas.

56.      Antonio Redoloza is a citizen of the Republic of the Philippines and currently resides in Texas.

57.      Alfredo Rosales is a citizen of the Republic of the Philippines and currently resides in Texas.

58.      Alejandro Santizas is a citizen of the Republic of the Philippines and currently resides in Texas.

59.      Feliciano Santos is a citizen of the Republic of the Philippines and currently resides in Texas.

60.      Giovanne Saramosing is a citizen of the Republic of the Philippines and currently resides in Texas.

61.      Florentino Sayago is a citizen of the Republic of the Philippines and currently resides in Texas.

62.      Felipe Siapno is a citizen of the Republic of the Philippines and currently resides

in Texas.

63.     Rosellier Somoza is a citizen of the Republic of the Philippines and currently resides in Texas.

64.     Roy Talledo is a citizen of the Republic of the Philippines and currently resides in Texas.

65.     Larry Urbano is a citizen of the Republic of the Philippines and currently resides in Texas.

66.     Baltazar Villejo is originally from the Republic of the Philippines and entered the United States on an E-2 visa and has since become a permanent resident of the United States. Mr. Villejo resides in Texas.

67.     Benjamin Villejo is a citizen of the Republic of the Philippines and currently resides in Texas.

68.     Franklin Villareal is a citizen of the Republic of the Philippines and currently resides in Texas.

## III.     VENUE AND JURISDICTION

69.     Plaintiffs do not allege a claim giving rise to federal jurisdiction. Thus, this case must be remanded to the Harris County District Court.

## IV.     STATEMENT OF FACTS

70.     From on or about 2006 through the present, in Houston, Texas, Tunis, the Republic of the Philippines and elsewhere, Norredine Ayed, Karim Sayed, Nida Sarmiento, Richard Dale Johnston, MBC, IPS organized and led a group of individuals, including Adrian Toups, Laysander Bustamonte, and Adriane Wilson who carried out acts of human trafficking in the Southern District of Texas and elsewhere.

71.     IPS was operated for the purpose of obtaining money by seeking labor services

contracts, recruiting foreign nationals, including Plaintiffs to come to the United States for employment, and using Plaintiffs to fulfill these contracts with various businesses located in Texas, Louisiana and other parts of the United States.

72.     The Conspirators profited by recruiting Foreign Workers in the Philippines and charged the Foreign Workers anywhere from approximately $1200 to $3,000 per person for what they represented as fees associated with obtaining a visa, for the cost of transporting them into the United States and placing them within the terms of their H2B or E-2 visas.

73.     The Philippines is a poor country. Compared to workers in the United States, many of the Plaintiffs made very little money and many of the Plaintiffs could not afford the placement fees. Many of the Plaintiffs were referred by IPS to banks and lending companies to take out loans to pay for their "placement fees" or took out loans from the Enterprise (specifically MBC) to facilitate the payment of fees charged by the Enterprise. Loans from the Enterprise were repaid to MBC through automatic withholding from the Foreign Workers' salary at IPS. However, Plaintiffs are informed and have reason to believe that IPS did not get permission to deduct these amounts from the workers.

74.     Based on current information, hundreds of Filipino nationals and possibly over a thousand workers have been the victims of the Conspirators' acts of human trafficking. These workers felt they had no choice but to leave IPS and either work illegally in the United States, or returned home to the Philippines to escape IPS.

### A.      Fraudulent Applications for Visas

75.     MBC was partially owned and operated by Nida Sarmiento, its President. Although MBC was purportedly owned 70% by Nida Sarmiento, MBC was operated and controlled by Norredine Ayed and Karim Ayed in concert with Sarmiento.

76.     MBC promised the Foreign Workers long term, stable and high paying jobs in the

United States in exchange for a "placement" fee.

77.     IPS and the Ayeds, in concert with Sarmiento and MBC, mailed, submitted and/or processed visa applications under oath to the United States Consul in Manila containing false representations about the existence, availability and the salaries for such jobs to the Foreign Workers to induce them to apply for visas and pay the so-called placement fees to MBC.

(a)     Plaintiffs, and other workers recruited by IPS, worked wherever IPS assigned them without regard to IPS' representations to immigration authorities.

(b)     IPS, Sarmiento and MBC, or others acting at their direction and under their control, made false representations to the U.S. Consulate in Manila about the existence, availability and salaries for jobs for the Foreign Workers to obtain visas for the Foreign Workers.

(c)     IPS applied for E-2 visas specifically representing that the Enterprise would pay the specified minimum base salary of the Foreign Workers and place them to work upon arrival into specific job locations the United States.

(d)     IPS did not amend Plaintiffs' E-2 visa applications or, where applicable, otherwise disclose to immigration authorities that Plaintiffs did not work at the locations and/or companies identified to the Consul in their E-2 visa applications.

78.     In or about 2009, IPS reportedly severed its ties to MBC and was no longer qualified as an E-2 visa employer.

79.     Plaintiffs are informed and have good reason to believe that IPS' representations to the United States government regarding ownership of 70% ownership by IPS were false, and merely a ruse to obtain E-2 visas from the federal authorities.

### B.     Forced Servitude, Hostile Environment and Fraudulent Representations to Plaintiffs

80.     In or about September 2006 through December 2006, Sarmiento and MBC, on behalf of IPS, falsely promised Plaintiffs and other workers that they would be paid a $1,000 allowance "with or without work", that they would all have stable or permanent, or long term jobs upon their arrival in the United States and that they would work for IPS for a period of five years, the life of the E-2 visa. Plaintiffs were also promised that IPS would help them get green

13

cards after working for IPS for two or three years. None of the Plaintiffs were offered assistance to get a green card and, on information and belief, very few, if any workers employed by IPS were sponsored by IPS when applying for green cards.

81.      Many Plaintiffs, however, were unemployed for weeks and sometimes <u>months</u> upon their arrival while IPS tried to locate jobs for them. Plaintiffs' periods of unemployment, or "standby" are identified in Exhibit A.

82.      Plaintiffs were charged back the majority of their $1,000 monthly "allowance" by IPS when they finally did get work through IPS. Thus, IPS placed Plaintiffs and other workers into debt bondage by making it almost impossible for them to re-pay their allowances without losing money or being unable to send money home to their families in the Philippines.

83.      Plaintiffs were forbidden from working for any other employer except for IPS. Further, all workers were directed to be available at or near their apartments while "benched", or on standby but IPS claims that it had no duty to pay Plaintiffs for time spent on standby, which it did not.  Other evidence of trafficking and forced labor include the following conduct by the Conspirators:

> a. Plaintiffs were required by IPS to send home 75% of their salary to a bank account in the Philippines and receive little, if any money, to spend in the United States.
>
> b. Plaintiffs were specifically forbidden from changing jobs even if they were unemployed and their families were not receiving an income.
>
> c. Plaintiffs returning home for vacation were instructed by Adrian Toups, Adriane Wilson or Laysander Bustamonte to surrender their passports to an MBC representative to ensure that they did not go to work for other overseas employers.
>
> d. For example, in or about July, 2008, Alfredo Rosales was instructed by Lays Bustamonte to surrender his passport when he arrived in the Philippines for what he throught was a one week vacation.  MBC refused to return his passport and Mr. Rosales had to file a complaint to get the passport back. Mr. Rosales ended up being on Philippine standby for eight months.

e.  In or about August of 2008, Efren Aliviano was sent back to the Philippines. Upon arriving at the airport in the Philippines, MBC confiscated his passport so that he could not obtain employment with other companies. Mr. Aliviano spent thirteen (13) months unemployed in the Philippines while MBC held his passport. During that time, he attempted to recover his passport so that he could obtain overseas employment with a different employer, but MBC refused to return his passport.

f.  Although Plaintiffs thought they were signing contracts for five years, they actually signed one year contracts. Plaintiffs were required to sign new contracts as a *precondition* to returning to the United States and attempt to obtain work. If they did not sign, they were told they would not be allowed to return to the United States.

g.  In one case, on October 17, 2007, at the IPS offices, Richard Dale Johnston gave Hermogenes Punzalan a written contract and told him to sign it. Mr. Hermongenes does not read English fluently but saw that his hourly rate was reduced from $20 to $17 per hour. When he started to question the change in rate, Mr. Johnston got angry, red-faced and told him that he would have him deported immediately if he did not sign the contract.

h.  In or about December of 2006, on the eve of their departure to the United States, Benjamin Villejo, Felipe Gutib, Eduardo Felix, Simeon Domingo, Elleser Cristobal, and Efren Aliviano attended a meeting held by Nida Sarmiento and Nourredine Ayed at the MBC offices where their agreed upon pay was decreased from $20 per hour to $18 per hour. Additionally, in or about February of 2007 Nida held a similar meeting was attended by Alfredo Rosales.

i.  IPS, through Adriane Wilson, controlled and opened mail sent to Plaintiffs, and refused, or threatened to refuse access to Plaintiffs' mail if they did not attend meetings, or attempted to retrieve their own mail.

j.  In or about April of 2009, Renato Acain was given a contract by MBC employee Donna Deocariza while in the Philippines and told that he would not return to the US if he did not sign it. The contract was in English. There was no explanation given. Mr. Acain was set to leave so he signed it.

k.  In or about November of 2008, Efren Aliviano was given a contract by Nourredine Ayed and Nida Sarmiento. It was the day before his flight to the United States. He was instructed to "just sign the contract."

l.  On or about November 16, 2009 while at the MBC offices, MBC gave Beinvenido Peralta a contract one day before his flight back to US. He had little to no time to try to read or understand the contract, which was in English. No explanation was given. He was told that if he didn't sign, he would not be able to go back to the US. He signed because IPS made it clear that he would not be able to work for any other company.

m. In or about December of 2009, Alfredo Rosales was given a contract by Lays Bustamante.  In order to take the job that IPS was offering him, he was required to sign the contract.

n. Many Plaintiffs at the Baytown apartments were told that they could not have guests in their apartments, were required to request permission to leave their apartments, and were subject to search of their apartments by IPS representatives, who had keys to their apartments.

o. Workers who complained about their unemployment were threatened by Adriane Wilson, Lays Bustamonte, Adrian Toups, Richard Dale Johnston and others with being sent home to the Philippines if they continued to complain about their unemployment or living conditions.

p. In or about April, 2009, Adriane Wilson disrupted a meeting of about 100 unemployed IPS workers with the AIM Group Incorporated, to prevent them from even talking to another employer about getting a job and supporting their families.

q. While on standby Anatalio Caang, Arturo Conclara, Camilo Lumagsao, Zosimo A. Olimba Jr., and Alfredo Rosales were all required to clean and move furniture into or out of apartments (that were not their own) without pay.

r. Similarly, Hermogenes Punzalon was used as an unpaid "driver" by Adriane Wilson when he was on standby.

s. Aurora Saludes opened and kept mail for Andrew Pandalita that contained his driver's license.  He learned from one of the IPS staff members (Glen) that Aurora Saludes had some of the mail.  When Mr. Pandalita asked Aurora Saludes why she had his driver's license, she told him that she took it because he wasn't allowed to drive.

t. Eduardo Patuput ordered an item from Ebay but did not receive it. When he checked the tracking number, he learned the package had already been delivered. Mr. Patupat talked to the apartment office and they called Adriane Wilson.  Ms. Wilson then told the workers that they no longer had the right to talk to the apartment office. About a week later, Ms. Wilson gave Mr. Pandalita his property and told him if he did anything like that [talk to the apartment manager] again, she would deport him.

u. Adriane Wilson opened a letter addressed to Benjamin Villejo from the DPS that contained his driver's license.  When he asked her why it was open, she stated that it was "standard operating procedure".

v. Thus, the workers were forced into involuntary servitude though misrepresentations and fraud and were further subjected to a hostile environment by the Conspirators.

84. On December 27, 2007, IPS filed an action against AIM entitled *International*

*Plant Services v. The AIM Group Incorporated and The AIM Group (Philippines) Inc. and Jerry "Mack" McClain,* Case No. 2007- 54691 (the Harris County Action") alleging breach of a No-Hire Agreement and Conspiracy in the Harris County District Court, 127th Judicial District, and later amended the Petition to add interference with contract, fraud/negligent misrepresentation, and additional claims of conspiracy.

85.     The true purpose of the lawsuit against AIM was to restrain AIM from competing against IPS by preventing AIM from hiring any IPS workers located anywhere in the world and to obtain a *permanent injunction* against AIM to restrain it from hiring any workers issued an E-2 visa through IPS or who was listed as an IPS employee with the Philippines Overseas Employment Authority ("POEA").

86.     The Harris County Action was filed only after Defendants learned that AIM was recruiting unemployed crafts workers from IPS in Texas.

The following specific examples are also representative of human trafficking and the fraudulent representations:

### 1. Jaygen Genon

87.     Jaygen Genon is 57 years old pipefitter from the Republic of the Philippines who is married with three grown children.

88.     In or about June 2005, Mr. Genon heard from relatives that MBC Human Resources were hiring pipefitters to work in the United States.

89.     Mr. Genon passed all the testing requirements like the pipefitting test, the National Center for Construction Education and Research (NCCER), the English language tutorial, the medical and the safety training.

90.     Mr. Genon was told that the placement fee was 100,000 pesos. Mr. Genon did not have enough money which he borrowed to pay the fee.

17

91.    An H2B visa was issued to Mr. Genon in August 2005.

92.    In or about June 2006, Mr. Genon was sent back to the Philippines

93.    Mr. Genon was instructed to surrender his passport at the MBC office.

94.    While in Philippines, Mr. Genon was on standby for three (3) months without allowance from June up to September 2006. Throughout the entire 3 months, Mr. Genon followed up with MBC almost every single day at the MBC office asking if they had a job for him.

95.    On August 28, 2006, Mr. Genon was issued an E-2 visa.

96.    In or about September 2006, at the MBC office, Mr. Genon paid a new placement fee of more than 100,000 pesos, which he borrowed.

a)  A new contract was given to Mr. Genon the day before his flight. The contract was in English and they asked us to sign it quickly. So, I quickly read the part that states about the $1,000 allowance and signed the same.

b)  Nida Sarmiento emphasized to Mr. Genon and the other workers that we can not work for any other employer in the US outside IPS. Ms. Sarmiento told Mr. Genon no "moonlighting" because he was contracted with IPS. And Ms. Sarmiento threatened Mr. Genon and the others that if they made mistakes at work, IPS could deport them back to the Philippines.

c)  Ms. Sarmiento assured the workers that because of the E-2 visa, they would have long term/permanent jobs in the US.

d)  She further promised Mr. Genon and the other workers that through this visa, IPS would help us obtain a green card.

97.    On September 21, 2006, Mr. Genon entered the US the second time and was assigned to work with the following:

a)  Turner, Louisiana (Sept. 21 – Dec. 2006)

b)  Standby for 2 months

c)  Turner, Louisiana (Jan. 2007 – Mar. 2007)

d)  Standby for 3 months

     e)  Turner, Louisiana (Jun. – Aug. 2007)

     f)  Standby for a month

     g)  Turner, Louisiana (Oct. – Nov. 2007)

98.    On November 11, 2007, IPS asked Mr. Genon to go on vacation because they said there was no work available.  Mr. Genon was on standby without allowance in the Philippines from until January 18, 2008.

99.    On January 19, 2008, upon arrival to the US, Mr. Genon was put on standby for another one and a half months. Then, IPS assigned him work as follows:

     a)     Inserv, Kansas (middle of Mar. – Jul. 2008)

     b)     Standby for 2 months

     c)     Inserv, Louisiana (Oct. 2008 – Feb. 2009)

100.    Around February 2009, Mr. Genon was sent home again to Philippines on standby for nine (9) months and received an allowance of a total of $400.

101.    Mr. Genon's passport was confiscated at the airport by an MBC staff named Edward.

102.    During his work with IPS, Mr. Genon was placed on standby 9 and a half months in the US and 14 months, 2 weeks and 3 days in the Philippines.

103.    When Mr. Genon found out that the allowances were deducted from his salary, he complained to Lays Bustamante. Mr. Bustamonte explained that it was IPS regulation that the allowances were considered cash advance.

104.    Mr. Genon did not consent IPS verbally or in writing to deduct this allowances from my salary.

105.    When IPS sent Mr. Genon's salary to the Philippines, it usually took three (3) months before his family received it.

106.    Mr. Genon was compelled to leave IPS for the following reasons in addition to the circumstances mentioned above:

a)    Mr. Genon left IPS because IPS broke their promise of a long term job. Mr. Genon was consistently on standby without salary. Mr. Genon needed a stable and permanent work situation because he had debts to pay in Philippines; car loans, placement fees, and he had a farming business that was destroyed because of his inability to send money for its maintenance. Mr. Genon also supported his grandchildren.

b)    In 2008, Mr. Genon had a rude and hostile encounter with Adriane Wilson. At that time, he had a job in Louisiana where she was transporting him. They agreed to meet at a meeting place at 5:00am. Mr. Genon got there on time and waited until 5:15am. Since she was not there at 5:15am, he took a quick break to go to the bathroom quickly. When he came back, Ms. Wilson was furious that he wasn't there when she arrived. She treated like he did not have the right to go to the bathroom, even though he was 15 minutes late. He was made to feel very small. Ms. Wilson even threatened not to give Mr. Genon work because he took a short bathroom break while waiting for her.

c)    During 2009, Sue Mariner got mad at Mr. Genon because he wanted a cash advance to go home to Philippines since IPS was sending me home without any money. Ms. Mariner refused to give him a cash advance, so he went to Lays Bustamante to make the request. Ms. Aurora Saludes then gave him $200.

d)    Mr. Genon's mails/letters were not given to him immediately especially the ones that were important and/or urgent like his IRS check, which expired before he received it.

e)    On or around March 2010, Mr. Genon was on standby for two (2) months. He had been waiting for jobs but was unemployed. Mr. Genon asked to visit his relatives while on standby. Adriane Toups approved the visit, and Mr. Genon left him his contact number and told them that they could call me anytime if a job became available. When he did not hear from IPS or MBC, Mr. Genon called the MBC office to find out what was going on. MBC told him that he had run away. He was shocked. He explained that he had permission from Mr. Toups to visit his relatives while on standby, but that did not help. Mr. Genon called Lays Bustamante who stated that he I had ran away. Mr. Genon insisted that he had not run away, but Mr. Bustamonte stated that IPS did not have a record of giving him permission to visit his family.

107.    As set out above, the representations made by Nida Sarmiento about long term/permanent jobs while in the United States and receiving $1,000 per month "with or without pay" were false and known to be false at the time the representations were made, and were intended to induce Plaintiff to leave his country and work for IPS in the United States. Mr. Genon reasonably relied on the representations.

20

108.    As set out above, Mr. Genon was placed in a general pool, assigned jobs as they became available, suffered over eight months of unemployment in the United States and over five and a half months of standby in the Philippines, financial losses and mental anguish as a direct and proximate result of his mistreatment by Defendants.

### 2.  Virginio Bolombat

109.    Mr. Bolombat is a welder and learned of jobs available through MBC in March 2006. Mr. Bolombat filed my application and, after a month, MBC called me and told me that he was scheduled to go to US with an H2B visa. The contract was for 9 months. I paid $2,000.00 for the placement fee. I paid half of the fee cash and the other half was salary deduction

110.    In May 2, 2006, Mr. Bolombat arrived in the United States. He worked from May 17 to June 8, 2006 with an H2B visa, but was on standby until July 28, 2006.  He was then told by IPS that he had to go home to the Philippines because my visa already expired.

111.    Mr. Bolombat was upset because all his income from the time working for IPS on the H2B visa went to paying the balance for MBC's placement fee.

112.    After Mr. Bolombat got home from US, he went to MBC. Where Nida Sarmiento told him to wait because they were going to replace his H2B visa with an E2 visa.  She asked for an additional $1,000 placement fee for the E2 visa. Mr. Bolombat complained about paying for another placement fee because he already paid a placement fee for the H2B visa and never got it back. But then Nida told him that if he didn't pay the fee, he could not work in the United States, "take it or leave it."  Mr. Bolombat was forced to pay the placement fee because he needed to work and earn money for his family. He took a loan with 20% interest from our neighbor to pay $1,000.00 for the E2 visa placement fee.

113.    Nida Sarmiento told Mr. Bolombat that although he had a short work period with his H2B visa, he would not have a problem having a job when he got back to the U.S. on an E-2 visa.

114.    Nida Sarmiento also stated that after 5 years IPS could help him apply and process his green cards.

115.    In September, 2006, at MBC's Nida Sarmiento gave Mr. Bolombat and a group of Filipino workers their contracts the day before their flight. Mr. Bolombat did not read the entire contract because he had limited understanding of English, only the part where it says our salary and benefits. Ms. Sarmiento the group the contracts and told them to read and sign it; however, they did not explain it to Mr. Bolombat or the others. Ms. Sarmiento became visibly irritated when one or two people started to ask her questions. Mr. Bolombat checked the spelling of his name, the pay rate and signed the document.

116.    Mr. Bolombat entered the United States on September 2006 with an E2 visa. A week later, I was assigned a job in Texas from September 15 to November 30, 2006.

        a.    December 2006 to February 2007, Mr. Bolombat was on standby.

        b.    March 2007 to November 2007 worked in Free Port Houston

        c.    November 6 to February 2008, Mr. Bolombat was on standby

        d.    February 15 to June 2008 worked in Nebraska

117.    Mr. Bolombat went to the Philippines for vacation in June 2008 where he only intended to stay for a month.

        a.    Before he left, he was told by Lays Bustamante to surrender my passport to MBC. At the airport in PI, a guy was waiting for me to get my passport.

        b.    After a month, Mr. Bolombat called MBC to ask when he was scheduled to return to work. To his surprise, MBC told to wait because they didn't have available jobs He called MBC several time to make follow up as to when he would return to the United States.

c. While on standby in the Philippines, Mr. Bolombat tried to apply for jobs abroad through another agency.

d. In August 2008, Mr. Bolombat was hired by an agency to work in Indonesia, which paid more than IPS. But the problem was Mr. Bolombat's passport was held by MBC. He tried to get my passport from MBC, but they refused to give it to him. Mr. Bolombat told them that he was hired to work in Indonesia and his papers were already processed and he was all set to go except for my passport.

e. When Mr. Bolombat insisted to get my passport back from MBC, MBC staff told me that I was scheduled to go back to the US to work. I just accepted the job from IPS, cancelled my application from the other agency and came back here the US.

f. One of the MBC staff named Donna told Mr. Bolombat to sign an IPS contract the day before his flight to US. Again, Mr. Bolombat signed the contract, but did not know what was in it because I don't read English that well. His name and pay rate was correct.

118. After Mr. Bolombat got back from the Philippines in November 20, 2008, he was put on standby until December 14, 2008.

119. Mr. Bolombat was assigned to work in South Carolina from December 15, 2008 to March 10, 2009

120. Mr. Bolombat was again on standby after working in South Carolina.

121. While on standby in 2007. Mr. Bolombat went to Adriane Wilson and talked to her about his allowance, which was on a "COMDATA" card. Mr. Bolombat explained that he had not received the allowance. However, Ms. Wilson told him to wait and stop complaining. Ms. Wilson further said, that if Mr. Ayed found out that he was complaining, he would send him home.

122. While on standby in May 2009, IPS reduced Mr. Bolombat's allowance from $324/week to 224/week and then later on, reduced it to $84/week for food allowance only. IPS even placed Mr. Bolombat in an apartment where there were 10 workers occupying because they could no longer pay the rent.

123. During standby in 2009, Mr. Bolombat complained to Lays Bustamante about being on standby. Mr. Bustamonte just told him to wait. He also complained to Andriane Wilson about not having work, but she just got mad and yelled at him and others who complained.

> g. Mr. Bolombat was expecting that while on standby he was to receive $1,000 a month as promised to us. However, any "allowance" paid during standby was later charged against any pay I received for work.
>
> h. Mr. Bolombat was never asked if he would allow IPS to take money out of his salary and he never, to his knowledge, consented in writing to salary deductions.
>
> i. Mr. Bolombat was not given $1,000 per month while he was on Philippine standby.

124. During mid-2009, Mr. Bolombat was told by Adriane Wilson that he could not work outside IPS. She also said that if Mr. Bolombat worked for another company or ran away, IPS would l get us deported, report us to the immigration, be part of the immigration watch list and he would be put into prison.

125. Mr. Bolombat found it hard to make complaints to IPS because they were not accommodating and the staff, Adriane Wilson and Sue Mariner always threatened Mr. Bolombat or others, saying that if we they did not like it, they would send him home.

126. During standby in 2009, Adriane Wilson informed Mr. Bolombat that IPS didn't have work anymore, so all Filipino workers will go home to PI. However, IPS gave us another option that if we chose to stay, we could have a "US vacation", find work but would no longer be part of IPS. We were not to stay at Baytown apartments and would get no more allowances. IPS would just contact us again if they had jobs. We signed our names to a paper and let IPS know where we were going to have our US vacation.

127. Mr. Bolombat lived off his allowances. All of his salary went to his family in the PI, but it took almost two (2) months before his family received the money.

a.     On one occasion, Mr. Bolombat's wife went to the bank to get his salary and asked why it took so long to receive his salary.

b.     The employee from the bank told Mrs. Bolombat that they were waiting for Mrs. Sarmiento's approval to release the money.

128.   The Bolombat family bills at home in the Philippines were always paid late because his family did not receive my salary in a timely way. He could not pay his children's school tuition on time so his wife was forced to make loans. These problems were a continuing source of worry and concern for his family and their future.

129.   Ms. Wilson had a key to Mr. Bolombat's apartment. In or around February 2007, while cooking at the apartment at Baytown Apartments, in Texas, Adriane Wilson suddenly came into Mr. Bolombat's apartment, shouted at him telling him to get ready for work without giving him any notice ahead of time about the job.

130.   In 2007, at the Baytown Apt., Mr. Bolombat attended weekly meetings. Adriane Wilson always yelled at him and the others, threatening that if they did not act right, they will be sent home.

131.   During 2007, Adriane Wilson secretly assigned people to monitor the workers at the Baytown apartment and checked up on them to see if they were in their apartments and what we were doing.  Mr. Bolombat felt like a criminal or a prisoner.

132.   During 2007, Ms. Wilson told Mr. Bolomat that he should be in his apartment at 10 p.m. Mr. Bolombat did not expect to have a curfew in the United States of America.

133.   As set out above, the representations made by Nida Sarmiento not having trouble working in the United States, and receiving $324 per week "with or without pay" were false and known to be false at the time the representations were made, and were intended to induce Plaintiff to leave his country and work for IPS in the United States. Mr. Bolombat reasonably relied on the representations.

25

134.    As set out above, Mr. Bolombat was placed in a general pool, assigned jobs as they became available, suffered fourteen months of unemployment, financial losses and mental anguish as a direct and proximate result of his mistreatment by Defendants.

### 3.  Romulo Dimatatac

135.    In or about September, 2006, Mr. Dimatatac heard about jobs through MBC.  At the MBC office, he filled out an application, took a trade test and an actual test for pipefitter. He I also took a National Construction Education and Research test to qualify to be a pipefitter.

136.    On November 14, 2006, MBC employee,, Lisa Pamintuan took him to the US Embassy for an E-2 visa interview. Before the interview, Ms. Pamintuan briefed us and told us that in case we were asked which company we are going to work for in the US, we should answer Repcon, Turner, Inserv or Wyatt.

137.    Mr. Dimatatac received his E-2 visa on November 15, 2006 and subsequently paid a $2,000 placement fee, which he borrowed.

138.    On December 14, 2006, Mr. Dimatatac signed a contract which was in English, not his native language which is Tagalog, one of the many languages in the Philippines. He was not fluent in reading and understanding English.  The contract was not explained to him in detail nor was he given time to understand it because when the MBC staff, Malou Binaday gave him the contract, it was already around 9 o'clock in the evening. Everyone was in a hurry to catch a bus going home. So, Mr. Dimatatac read the part that stated his salary and then signed it.

139.    During the December 14, 2012 briefing, Nida Sarmiento promised that Mr. Dimatatac: (a) would be paid $20 per hour; (2) receive an allowance of $1,000 with or without work; (3) the travel and lodging accommodations will be provided free; (4) he will have free transportation from port of origin to the work site; (5) he would have a long term permanent job; and that IPS would assist him in obtaining a green card.

140.     However, on December 21, 2006, a few days before the flight to the United States, and after paying the placement fee, Nida required Mr. Dimatatac and other workers to sign another contract where she changed the rate to $18 per hour. She said that this change will only be temporary and would only last 3 months. She further said that after three months if we don't received $20 rate, she will refund our placement fee of $2,000.

141.     When the workers tried to ask questions during the December 21, 2006 meeting, they were told to "take it or leave it". Mr. Ayed (the older Ayed) told the workers that America is a paradise. If you do good works there, you can get a green card and become a citizen. Since Mr. Dimatatac had already paid the placement fee, he felt like he had no choice so he signed the said contract.

142.     Mr. Dimatatac entered the United States on December 24, 2006, Upon arrival, we stayed at the Holiday Inn, Houston for 2 weeks on standby and were then transferred to Howard Johnson Hotel, Houston and stayed there another 3 weeks on standby. I was on standby for five weeks before I finally started working on January 29, 2007.

143.     On or around October 2007, I have noticed that some workers were paid higher than others although we were doing the same job and working the same hours. When someone complained and others ran away because of this unfair treatment, IPS changed the rate to $20. On or around June 2010, Mr. Dimatatac decided to run away from IPS.

>    a.) Contrary to the promises, the allowances paid by IPS were deducted from his salary.
>
>    b.) He was told that he could not work for any other company and that IPS was the only company he could work for. However, IPS was not living up to its promises, he falling into debt, and would be forced to repay IPS back the money received on standby. His two children were forced to drop out of college because of his being placed on standby.
>
>    c.) Mr. Dimatatac was on standby for about 4 and a half months even though Nida Sarmiento promised that he would be working the entire time we were in the Philippines.

27

d.) Adriane Wilson usually threaten him and others. For example, in or about 2010, one of the workers named Deodato Lopez was not present during a meeting with Ms. Wilson at Baytown Apartments. Ms. Wilson called our attention to a "letter" she said that Lopez can be arrested by police anytime. And she told us that whoever is following the example of Lopez will be arrested as well. This incident happened because Mr. Lopez complained to the police about Ms. Wilson, who always yelled at him.

e.) When on standby Mr. Dimatatac was always stressed thinking about the debts and bills he had to pay in Philippines like the placement fee which it took him 11 months to repay. Also, the allowances were deducted from our salary which kept him constantly indebted to IPS. Everytime he got a job, he had to repay IPS for allowances that were supposed to have been paid to him "with or without pay."

144.    As set out above, the representations made by Nida Sarmiento about working for a specific employer, working the entire time they were in the United States making $20 per hour also receiving $324 per week "with or without pay" were false and known to be false at the time the representations were made, and were intended to induce Plaintiff to leave his country and work for IPS in the United States. Mr. Dimatatac reasonably relied on the representations.

145.    As set out above, Mr. Dimatatac was placed in a general pool, assigned jobs as they became available, suffered lengthy periods of unemployment, financial losses and mental anguish as a direct and proximate result of his mistreatment by Defendants.

### 4.  Simeon Domingo

146.    In or about June 2006, Mr. Domingo learned that MBC was hiring welders to work in the United States. He went to the MBC office in Manila and signed an application where he paid to get tested in welding.

147.    Mr. Domingo received an E-2 visa on November 28, 2006.

148.    On December 20, 2006, Nida Sarmiento requested a nonrefundable placement fee of 75,000 pesos ($1,500). Mr. Domingo didn't have enough money at that time so he got a loan.

149.    On or about December 20, 2006, Nida Sarmiento told Mr. Domingo and a group of other workers that: (a) they would be paid $20 per hour; (b) Ms. Sarmiento assured him that we will have an allowance of $320 a week "with or without work"; (c) they would be working the entire time while in the US and that they had long term jobs waiting for them; and (d) that the travel and lodging accommodations will be provided free.

150.    Hearing all these assurances from Nida Sarmiento, Mr. Domingo got excited about coming to the US because the jobs in the US paid more than in the Philippines, and he would be able to send money home to support his wife and children.

151.    Nida Sarmiento gave Mr. Domingo a contract that was written in English, not his native language which is Tagalog. Mr. Domingo was not fluent in reading and understanding English. The contract was not explained to him in detail, Mr. Domingo read the part which states about salary and allowances and signed it.

152.    On or about December 23, 2006, the night before his flight to the US around 7:00pm, Nida came to him and the other workers waiting to fly out, and had him, and the others sign a new contract that changed the $20/hourly rate to $18 per hour. They were shocked and uneasy about the new contract, but Ms. Sarmiento said "take it or leave it," and that if they didn't sign the contract, they could not leave for the US. Mr. Dimatatac didn't feel he had a choice but to sign because he was ready to leave for the United States the next day and would lose his nonrefundable placement fee if he left.

153.    Mr. Domingo entered the United States on December 24, 2006. Upon arrival, he stayed at Holiday Inn, Houston, TX and was on standby with his group for one week. Then he and his group were transported to Howard Johnson Hotel and standby for two (2) months.

> (a) After more than two (2) months of standby without work, Mr. Domingo was sent to West Lake, Louisiana and worked there for a week. Then, he went to Entergy, Louisiana, to work for one week.

After that, Mr. Domingo was sent back to Baytown and standby for one (1) month.

(b) In 2007, coworker, Francisco YoungCo, told Mr. Domingo that he complained to Nida about the $18. Nida told him that the $2 will be paid to us as back pay. However, that never happened.
(c) On or around January 2008, Mr. Domingo was back to Baytown apartment on standby for 3 months. IPS assigned him to go to Port Allen Refinery where he worked for 2 days only (2/11 – 2/13, 2008). Mr. Domingo was on standby from March to May 2008. He worked at Calumet, Louisiana. During June, July, August and September, 2008, he was again put on standby. On October up to December 2008, Mr. Domingo worked at CCC Group Inc., La Porte, TX. And on January 2009, he was again on standby again for one (1) month.

(d) During the months of February up to August 2009, IPS designated Mr. Domingo to work for Turner Group Co., Louisiana. On August 6, 2009 through March 2010, Mr. Domingo was sent back to Baytown and placed on standby.

154.    On or around April 2010, IPS staff members named "Sue", believed to be Sue Mariner, and Adriane Wilson, told him to go home to Philippines because there was no work available.

a.    However, Sue offered Mr. Domingo a job in Ohio. However, he had to sign a contract stating that the hourly rate was only $15 per hour for 3 months, and then a raise back to $20.

b.    Both Sue and Ms. Wilson threatened Mr. Domingo that if he don't sign the contract, they would deport him. He got scared.

c.    They also told Mr. Domingo that he should not complain to any lawyer.

d.    Because he desperately needed a job to support his family, and did not want to return home destitute, he signed the contract.

e.    After signing this contract, IPS sent Mr. Domingo to Ohio to work for Scott Process System, where he worked for 7 days.

155.    Sue [Mariner] informed Mr. Domingo that he had accumulated a debt of $7,000. When he asked her why, she told him standby time required that he pay back the $320 a week allowance and they deducted this from my salary as cash advance.  Mr. Domingo does not recall

or believe that he consented verbally or in writing for IPS to deduct his allowances from his salary.

156.   Mr. Domingo asked one of his coworkers about the deductions and was told that if he complained, IPS would not listen or do anything about it, so he did not complain.

157.   Mr. Domingo was informed that he could not work for another employer even though he was always on standby at IPS. Around 2010, he learned from co-worker Arnold Umali, that Ms. Wilson took away Mr. Umali's salary because he was caught working for another employer.

158.   Since coming to the United States, Mr. Domingo didn't go home to the Philippines because he never had enough money. Mr. Domingo's total standby time while working for IPS was about 19 months and 1 week.

159.   Thus, the representations set out above to Mr. Domingo about working for a specific employer, working the entire time they were in the United States making $20 per hour, and receiving $324 per week "with or without pay" were false and known to be false at the time the representations were made, and were intended to induce Plaintiff to leave his country and work for IPS in the United States. Mr. Domingo reasonably relied on the representations.

160.   Instead, Plaintiff was placed in a general pool, assigned jobs as they became available, suffered lengthy periods of unemployment, financial losses and mental anguish as a direct and proximate result of his mistreatment by Defendants.

### 5.   Hermongenes Punzalon

161.   In or about August, 2012, Hermongenes Punzalon applied to MBC for a position overseas in the United States as a pipefitter. Mr. Punzalon paid a non-refundable placement fee to MBC of about $2,000.  MBC's Lisa Parmintuan took him to the Consulate to get him an E-2 visa.

162.    After Mr. Punzalon's E-2 visa was approved, in or about September, 2012, he attended a meeting at MBC offices in Manila. At this meeting, on or about September 20, 2012, Nida Sarmiento, represented that: (a) he would be paid $20 per hour; (b) he would receive an allowance of $1,000 per month "with or without work", which he was led to believe was above and beyond his wages; (c) is jobs in the United States would be long term, permanent jobs each lasting during the five-year visa period and (d) that there would be with no long gaps in between employment. Sarmiento also told Mr. Punzalon and others that IPS would assist them in obtaining a green card after he worked for a couple of years. Mr. Punzalon was very excited about getting a green card through IPS.

163.    Mr. Punzalon reasonably and justifiably relied on these representations.

164.    In fact, the representations about working for a specific employer, working the entire time they were in the United States making $20 per hour also receiving $324 per week "with or without pay" were false and known to be false at the time the representations were made, and were intended to induce Plaintiff to leave his country and work for IPS in the United States.

165.    Instead, Plaintiff was placed in a general pool, assigned jobs as they became available, suffered lengthy periods of unemployment, financial losses and mental anguish as a direct and proximate result of their mistreatment by Defendants. Mr. Punzalon went into debt to IPS and was unable to pay many of his bills.

166.    In May, 2009, Mr. Punzalon ran away from IPS because he had experienced eight (8) months of standby, and was required to pay IPS the $1,000 per month that he thought paid "with or without work" but which IPS claimed was an "advance."

167.    In September, 2009, Mr. Punzalon went to MBC's office in the Philippines and met with both Nida Sarmiento and Nourredine Ayed. Mr. Punzalon explained to them that he

and other workers were being mistreated in the United States—the standby time and abuse of Filipinos.

168.    Nourredine Ayed and Ms. Sarmiento promised him that they would take care of it and that things would be better if he went back. Both Mr. Ayed and Ms. Sarmiento told Mr. Punzalon that he would need to pay another 50,000 peso placement fee and surrender his passport to send him back to the US. Mr. Punzalon reasonably relied on their promises, surrendered his passport, borrowed the money and paid it to MBC. At the time of their promises, both Mr. Ayed and Ms. Sarmiento knew that their promises were false and intended that Mr. Punzalon rely on the representations. Mr. Punzalon returned to MBC to get his passport and signed a paper to get his passport returned when MBC failed to call him to return to the United States. On December 26, 2009, Mr. Punzalon traveled back to Texas and tried to report to IPS on his own. In January, 2010, he talked with Lays Bustamonte who told him that IPS refused to hire him back.

169.    Thus, the representations set out above to Mr. Punzalon about working in a long term/permanent job the entire time he was in the United States making $20 per hour, and receiving $1,000 per month "with or without pay" were false and known to be false at the time the representations were made, and were intended to induce Plaintiff to leave his country and work for IPS in the United States. Mr. Domingo reasonably relied on the representations.

170.    Instead, Plaintiff was placed in a general pool, assigned jobs as they became available, suffered lengthy periods of unemployment, financial losses and mental anguish as a direct and proximate result of his mistreatment by Defendants.

### 6.  Benjamin Villejo

171.    Mr. Villejo was recruited by MBC and was told that he would work under the E-2 visa for five years, borrowed $2,000 from an MBC employee and attended a briefing in

December 2006 where he signed a contract that said he would be paid $20 per hour and $1,000 per month with or without pay. He did not understand written English so he checked the pay rate and the spelling of his name. Prior to signing the contract, Nida Sarmiento told Mr. Villejo that: he would receive $100 "with or without pay" and would have long term employment working the entire time he was in the United States, and that IPS would help him get a green card after three to four years.

172.    Mr. Villejo later attended a briefing on or about December 21, 2006, where Nourredine Ayed and Nida Sarmiento informed Mr. Villejo and about 100 workers that their pay rates were being reduced from $20 per hour to $18 per hour. Mr. Ayed told them that they could "take it or leave it." Because they had already paid a non-refundable placement fee, and had a visa issued to IPS, and were ready to leave, Mr. Villejo had no choice but to sign the contract. Ms. Sarmiento repeated the promises that the workers would work the entire time they were in the United States with long term jobs.

> a.    Mr. Villejo and others were required to ask permission to leave the Baytown Apartments. This was to make sure that they were accounted for if there was a roll call. If we were not around for roll call, which happened every day, Adrienne Wilson would make sure we did not get a job.
>
> b.    Mr. Villejo attended weekly meetings with Ms. Wilson and learned that IPS deported workers who complained about being unemployed.
>
> c.    In August, 2007, Mr. Villejo met with Adrian Toups and Adrienne Wilson at IPS. He was told that he had to return to the Philippines for vacation because there was no work. Adrian Toups had him sign a form that said his vacation would last only three weeks or 21 days. Mr. Toups also told Mr. Villejo that he had to surrender my passport to MBC when I arrived in the Philippines. Mr. Villejo did not return for ten months, and was on Philippine standby until June 12, 2008.
>
> e.    Mr. Villejo surrendered his passport to Ms. Binaday, with MBC. He called in after three weeks but they told him that he was not scheduled to return and to just wait. He called after a month and got the same response. After five months, Mr. Villejo asked Ms. Binaday if he could have his passport back. She asked why he needed his passport. Mr. Villejo told her that he needed to take out a loan and the lender wanted to see his passport. Ms. Binaday required him to

sign an agreement that he would pay $2,000 to MBC if I did not return his own passport. He signed the paper.

f.      Mr. Villejo suffered about eight months of standby in the United States and eleven months of standby in the Philippines.

173.    Thus, the representations set out above to Mr. Villejo about working in a long term, permanent job the entire time he was in the United States making $20 per hour, and receiving $1000 per week "with or without pay" were false and known to be false at the time the representations were made, and were intended to induce Plaintiff to leave his country and work for IPS in the United States. Mr. Villejo reasonably relied on the representations.

174.    Instead, Plaintiff was placed in a general pool, assigned jobs as they became available, suffered lengthy periods of unemployment, financial losses and mental anguish as a direct and proximate result of his mistreatment by Defendants. Mr. Villejo suffered over twenty months of unemployment causing him severe financial loss and mental anguish.

### 7. Nicasio Mangilimotan

175.    On or around April 2006, after paying a placement fee, Nicasio Mangilmotan obtained an H2B Visa through MBC to work in the United States for IPS.

Upon arrival in the US on May 2, 2006, Mr. Mangilimotan was put on standby for fifteen (15) days. Then IPS assigned me to work with the company: Chevron, Texaco, Biloxi, Mississipi (May 17 – Jun. 15, 2006). Mr. Mangilimotan was then placed on standby for more than a week.

176.    On June 21, 2006, Mr. Mangilimotan was sent home to Philippines because his visa was reportedly set to expire the following month (July 1, 2006).

a) Nida Sarmiento ordered an MBC staff member named Edward to confiscate Mr. Mangilimotan's passport upon arrival in the Philippines. Edward informed Mr. Mangilimotan that IPS would not process his new visa unless he surrendered the passport.

b)  Mr. Mangilimotan was on standby in the Philippines from July to August 2006 without allowance.

c)  While in the Philippines, Mr. Mangilimotan talked to Nida about returning to the U.S. on an E-2 visa and complained about not staying long enough in the US to justify paying the placement fee of 50,000 pesos. She offered to send him back on an E-2 visa. Nida told me that I could take a re-loan at AsiaLink.  She then processed the papers and, after h e got a plane ticket, M r . M a n g i l i m o t a n went back to AsiaLink and got another loan.

d)  Nida offered and promised Mr. Mangilimotan and  a group of other workers that the E-2 visa guarantees permanent and long term jobs in the US but they had to pay an additional placement fee of 50,000 pesos to process the E-2 visa.

e)  She further assured them that this E-2 visa will give us access to obtain a green card.

f)  She also stated that they would have lots of work under this visa because it is a five-year period and they would not have to worry about being on standby anymore.

g)  Upon hearing all these promises from Nida herself, Mr. Mangilimotan paid the additional amount of 50,000 pesos as additional placement fee by borrowing from Asialink.

177.   Mr. Mangilimotan came back to the US on an E-2 visa on September 21, 2006.

a)  At the MBC office, I was asked to sign another contract two days before my flight. The contract was in English and they didn't give us enough time to read and understand the same. They just told us "*take it or leave it*".

b)  Mr. Mangilmotan signed the contract because if I didn't, he would not be allowed by IPS to go back to US. Also, Mr. Mangilimotan signed the contract because MBC made it clear that he could not work overseas for any other company because IPS sponsored and got his visa. Under the circumstances, Mr. Mangilmotan felt he had no choice but to sign.

178.   Upon arrival on September 2006, I was again put on standby for about a week.

IPS then assigned him to work with the following companies:

a)  Motiva, New Orleans (1month)

b)  Citgo,  Lake Charles (November 2006 - March 2007)

36

c) Total, Gonsales, Louisiana (21 days)

d) Dow Chemical, Port Allen, New Orleans (1month) more or less

e) Standby from last week of May to August 2007 (2 months)

f) Citgo (August up to second week of September 2007)

g) Standby for a week

h) Laurel, Montana (about 4 months)

i) Calumet Plant, Shreveport (2 weeks)

j) Standby for 1 week at Baytown

k) Wyoming Power Plant (2 months)

l) Standby for two weeks

179.   On June 16, 2008, after being on standby for two weeks, Mr. Mangilimotan went home to the Philippines. Although he was supposed to spend vacation for two weeks only, he was forced to stay about four (4) months because every time he followed-up at MBC's office, he was told that he was not scheduled to return because there were no jobs available.

180.   During the last week of January 2008, Mr. Mangilmotan was out of work. He talked to Mr. Bustamante when he realized that IPS was deducting the guaranteed "minimum monthly salary of US$1,000 "with or without work". Mr. Bustamonte said that that was a payment only for a year, but Mr. Mangilmotan believed that his contract did not limit the guaranteed salary to only one year. Even though he was upset, Mr. Mangilimotan needed the job to support his family, and had no choice but to keep working.

181.   During 2008, Mr. Mangilimotan became desperate because he was working, making money, but would get a "zero" paycheck from IPS because he was in "debt bondage "to repay the "guaranteed" "1,000 salary with or without work."

182.    Mr. Mangilimotan returned to the Philippines on June 16, 2008 to visit his family.

183.    On October 20, 2008, Mr. Mangilimotan met with Nida Sarmiento at the MBC to attend an orientation meeting with six other people. Nida told him that he was leaving the next day, and that he needed to sign a contract, which provided that money be deducted directly before it got to our personal bank accounts.

> a)  They told us that we were going to have to pay a new placement fee of $1,400 to go back to the United States.
>
> c)  Mr. Mangilimotan did not realize nor was told that I would be penalized for going home to visit my family.
>
> c)  Mr. Mangilmotan complained to Nida Sarmiento that she previously promised that his E-2 visa allowed me to go back to the US until 2011.
>
> d)  Ms. Sarmiento told Mr. Mangilimotan she had the power to let me go. She told me, "*Your one month salary was $3,400 so your fee is half of that money*". She told me that I could take it or leave it. I had no choice but to go back to the US because I was in debt from being out of work.
>
> e)  There was a 15,000 pesos balance on my first loan. I borrowed 100,000 pesos from an employee of MBC named Malou Binaday and paid her back 167,000 pesos.

184.    Mr. Mangilimotan had to enter into another loan with AsiaLink for 80,000 pesos to come back in October 2008.

185.    Even when he paid on time, AsiaLink representatives would call Mr. Mangilmotan's wife to "remind" her of the next payment. It got worse when he missed a payment while out of work, or did not make enough money to make the payments. Each time he missed a payment, the interest went up. AsiaLink's representatives harassed his wife when he missed a payment.

186.    In January 2008, a number of people, including Ely Ragos and Danny Orguchada were benched and told Mr. Mangilimotan that when they complained

about being benched, they were told by IPS coordinators and employees "*take it or leave it*", meaning go back to the Philippines if they did not like their pay.

187.    In or around April 2009, Aurora Saludes, who works for IPS, told Mr. Mangilimotan that if he complained about his job or pay, he might be sent back to the Philippines.

188.    On or around April or May 2009, Mr. Mangilimotan talked to Adrian Toups, one of the IPS managers, and asked him to let him stay in the US because of all my debt problems in the Philippines.

> a)  Mr. Toups told Mr. Mangilimotan that he had a safety violation (a lanyard), but other people (almost twenty people) had shift violations, including Elbert Batidor, Mr. Sunugan, Mr. Daeanay, Lowell Alporque, Lloyd Labang had the same alleged safety violation and still got work from Mr. Toups and IPS.
>
> b)  Mr. Mangilimotan complained to Mr. Toups that other people were being treated better than he was.
> c)  Mr. Mangilimotan became so frustrated that other people were given work (with the same safety violation) that he started to cry in front of Mr. Toups, which deeply distressed him.
>
> d)  Mr. Toups told Mr. Mangilimotan that, "*If you always complain, you will go home to the Philippines.*" Mr. Mangilimotan contends that the real reason that they he did not get work was that he complained about unfair treatment and not getting work to Mr. Toups and Ms. Wilson.

189.    On or about April, May and June 2009 (three separate times) Mr. Mangilimotan talked to Adriane Wilson about not getting work.

> a)  In his last discussion with her in June 2009, Ms.. Wilson got very angry with Mr. Mangilimotan for asking for work and started shouting that she would not give me work because of the safety violation and that I was talking to her about getting work.
>
> b)  Mr. Mangilimotan told Ms. Wilson "Treat me like a man, don't bark at me like a dog". She got madder at me.
>
> c)  From discussions with both Mr. Toups and Ms. Wilson, it was clear to Mr. Mangilimotan that they were punishing him for complaining about not

having work and being treated unfairly.

190.   Mr. Mangimotan received many pay slips from ADP that were "zero" pay slips because he did not make any money.

191.   On June 19, 2009, Mr. Bustamante called and told Mr. Mangilimotan that IPS had charged him for a ticket from the United States to the Philippines even though he was unemployed. Mr. Mangilimotan asked Mr. Bustamonte how can he was expected to pay for a ticket when IPS did not give him work, and when he had debts at home. He was also told by Mr. Bustamante that if he ran away, MBC would charge him $400,000 pesos (about $8,500).

192.   On June 16, 2009, Mr. Mangilimotan felt compelled to leave IPS for the following reasons, in addition to the circumstances mentioned above:

a)  Adrienne Wilson abused him verbally because he was always asking for work.

b)  MBC and IPS violated their verbal and written contract with Mr. Mangilimotan and other workers placing him his family into deep financial, emotional and physical distress.

c)  Mr. Mangilimotan was on standby for sixteen (16) months, and was frequently unable to send money to his children. As a result, they had to stop schooling.

d)  In addition, when Ms. Wilson monitored whether he was in his apartment, or if he was absent from work for sickness, she would make sure that IPS deducted $40 from his pay or allowance.

e)  Adriane Wilson also deprived Mr. Mangilimotan of getting his mail when he needed it and when he did get mail, many letters had been opened. For example, on one occasion when she came to deliver the mails, Mr. Mangilimotan was in another room and didn't hear her call his name. When a coworker told him that she called his name, he immediately went to her and asked for his mail. She said, *"No way! You will get it next Thursday."*

193.   After filing a lawsuit in Harris County Texas against IPS, Mr. Mangilimotan's family received a lawsuit from MBC against him in the Philippines at POEA for breach of

contract. His wife received repeated harassing phone calls from MBC asking for Mr. Mangilimotan's phone number and address in the US.

194.    Thus, the representations set out above to Mr. Mangilimotan about working the E-2 visa guaranteed long term, permanent job while he was in the United States, and receiving $1,000 per month "with or without pay" were false and known to be false at the time the representations were made, and were intended to induce Plaintiff to leave his country and work for IPS in the United States. Mr. Domingo reasonably relied on the representations.

195.    Instead, Plaintiff was placed in a general pool, assigned jobs as they became available, suffered lengthy periods of unemployment, financial losses and mental anguish as a direct and proximate result of his mistreatment by Defendants.

196.    In or about 2006 through 2010, Plaintiffs were routinely told by either Richard Dale Johnston, Adrian Toups, Laysander Bustamonte, and Adriane Wilson that they could not work for another employer while in the United States but could work only for IPS because IPS sponsored their visas. These representations were false, known to be false, or recklessly made without regard to their falsity to keep Plaintiffs working for IPS.

197.    None of the Plaintiffs were offered help by IPS to obtain a green card and, on information and belief, IPS did not have a policy of routinely helping any of its workers in obtaining green cards.

**(D)    Witness Tampering**

198.    Defendants IPS, MBC and Sarmiento, aided and abetted by the Ayeds, committed the acts designed to protect the Conspirators from discovery, or being held responsible for their conduct.

199.    Nida Sarmiento did, on or about Tuesday, July 13, 2009, knowingly and intentionally intimidate, threaten and/or corruptly persuade or attempted to intimidate, threaten,

and/or corruptly persuade Rodolfo Sesaldo to change sworn affidavit testimony provided to AIM on that date. Sarmiento reportedly called Sasaldo by telephone from the Philippines several hours after disclosure of the Affidavit and told Mr. Sesaldo that he was "causing big trouble" and then further asked him "What will happen to your family if you are in jail?" (or words to that effect). These statements were all calculated, and which did, in fact, cause Mr. Sesaldo to fear for the physical safety of his family in the Philippines. Sasaldo was directed by Nida Sarmiento to report to IPS' offices the next day. Sasaldo did, on July 14, 2009, meet with IPS lawyers Travis Vargo and Karyne Ghantous and changed his affidavit to deny material testimony from the sworn affidavit testimony executed by Sasaldo on July 13, 2009, all in violation of state and federal law.

200.    Norredine Ayed and/or Karim Ayed caused its lawyers to sue and harass Jerry "Mack" McClain the AIM case for giving testimony adverse to IPS and to prevent him and other former IPS employees from attending and testifying at trial against IPS or as retaliation for giving truthful, but adverse testimony against IPS, all in violation of state and federal law.

201.    IPS, Karim Ayed, and Karyne Ghantous sued "Mack" McClain, The AIM Group (Philippines) and The AIM Group Incorporated with the intent to influence, delay, and harass without any evidence of conspiracy and maintained its lawsuit despite requests by counsel for AIM to dismiss the claims. IPS, Nourredine Ayed, Karim Ayed and Ghantous refused to drop IPS' claim until shortly before trial in *International Plant Services v. The AIM Group Incorporated*.

202.    Through Karyne Ghantous, an attorney for IPS, IPS and the Ayeds knew of a subpoena *duces tecum* issued by AIM to Richard Dale Johnston, former President of IPS seeking documents and testimony concerning a Seconding Agreement.

> (e) At the time the subpoena was still pending and known by IPS and Ghantous to be pending, Karyne Ghantous and IPS <u>directed</u> Johnston's

attorneys, Eliot Tucker and Roy Barnes, to destroy all copies of the documents.

(f) On or about May 22, 2009, Eliot Tucker informed Ms. Ghantous that he could not destroy the documents and that Johnston "had copied a significant amount of documents/data and that Johnston was required to comply with the AIM litigation subpoena absent an executed settlement and court order."

(g) On May 29, 2009, Karyne Ghantous communicated a threat to Richard Dale Johnston through his attorney, Eliot Tucker that IPS would file lawsuit against him for theft of confidential documents from IPS if he did not destroy documents, all in violation of state and federal law.

203.    On June 3, 2009, after Johnston refused to destroy documents that had been subpoenaed by AIM, IPS, on behalf of the Enterprise, sued Richard Dale Johnston for theft of confidential documents in *International Plant Services v. Richard Dale Johnston*, Case No. 2009-35134, Harris County District Court, 133rd Judicial District.

204.    All the above acts were undertaken either to prevent the discovery of evidence relevant to this case, chill testimony of company employees who might testify adversely to IPS, or to intimidate IPS workers from suing to enforce their rights.

## HUMAN TRAFFICKING

205.    Plaintiffs reincorporate and reallege each of the above allegations as though fully set out herein.

206.    Texas law prohibits human trafficking by individuals and companies, who are subject to criminal prosecution and punishment as a second degree felony. TEX. PENAL CODE §20A.02(b) (the "Criminal Statute").

207.    Continuous Trafficking of Persons, that is, commission of two or more acts of trafficking with a thirty day period, is punishable as a first degree felony. TEX. PENAL CODE §20A.03(a).

208.    The statute defines the term "Forced labor or services" to mean "labor or services,

other than labor or services that constitute sexual conduct, that are performed or provided by another person and obtained through an actor's use of force, fraud or coercion." TEX. PENAL CODE §20A.01(2).

209.    The statute defines the term "Traffic" to mean "transport, entice, recruit, harbor, provide, or to otherwise to obtain another person by any means. TEX. PENAL CODE §20A.01(4).

210.    Individuals and companies guilty of violating the Criminal Statute et. seq. are civilly liable pursuant to Section 98.001 et. seq. Civil Practice & Remedies Code (the "Civil Statute").

211.    The Civil Statute provides, in pertinent part, that: "A defendant who engages in the trafficking of persons or who intentionally or knowingly benefits from participating in a venture that traffics another person is liable to the person trafficked, as provided by this chapter, for damages arising from the trafficking of that person by the defendant or venture." (emphasis supplied)

212.    The Civil Statute provides for joint and several liability (§ 98.005) and further provides that: "This chapter shall be liberally construed and applied to promote its underlying purpose to protect persons from human trafficking and provide adequate remedies to victims of human trafficking."

213.    From in or about mid-2006 through 2010 Nourredine Ayed, Karim Ayed, Nida Sarmiento, IPS, Richard Dale Johnston, Adrian Toups, Laysander Bustamonte, Adriane Wilson and MBC acted individually or in concert with other co-conspirators within and outside this district in committing acts of human trafficking within the meaning of TEX. PENAL CODE §20A.02(a)(1) in that each of them knowingly trafficked another person with the intent or knowledge that the trafficked person would be engaged in forced labor or services.

214.    At all relevant times, Nourredine Ayed, Karim Ayed, Nida Sarmiento, IPS, Richard Dale Johnston, and MBC acted individually or in concert with other co-conspirators within or outside this district in committing acts of human trafficking within the meaning of TEX. PENAL CODE §20A.02(a)(2) in that each of them received a benefit from participating in a venture that involves an activity described by Subdivision (1) including by receiving labor services the person knows are forced labor or services.

215.    In addition to the acts set out above, Defendants Karim Ayed and Nourredine Ayed were well aware of the E-2 visa requirements and worked directly, or indirectly with Richard Dale Johnston to obtain E-2 visas through the United States government.

216.    The Ayeds obtained financial benefits from funding and controlling the operations of IPS, as did Nida Sarmiento from her operation of MBC.

217.    If Sarmiento and MBC were truly 70% owners of MBC, then Ms. Sarmiento received a direct financial benefit from IPS operations as well.

218.    Richard Dale Johnston received a bonus or commission for all workers who came to the United States to work for IPS.

219.    On information and belief, in addition to their salaries, Adrian Toups, Laysander Bustamonte, Adriane Wilson, and Sue Mariner also received benefits from IPS as bonuses for disciplining, intimidating, transporting, coercing or otherwise forcing Plaintiffs to provide forced services and labor from Plaintiffs. These individuals were aided and abetted by Richard Dale Johnston, Karim Ayed and Nourredine Ayed in creating a hostile work and living environment for plaintiffs and other Filipino workers.

220.    On or about December 21, 2006, Ms. Sarmiento, aided and abetted by Nourredine Ayed, announced that IPS was reducing the contract rates from $20 to $18 per hour and told the workers that they could "take it or leave it." Mr. Ayed falsely painted a glowing picture of

working for IPS and also, at one point, reportedly told the workers to "take it or leave it."

221.    On or about 2007 through 2010, at or about the dates set out in Exhibit C, Laysander Bustamonte, Adriane Wilson and Adrian Toups directed Plaintiffs to surrender their passports when they returned to the Philippines for vacation.

222.    On October 17, 2007, Richard Dale Johnston became very angry and threatened to immediately deport Hermongenes Punzalan if he did not sign a contract to work for IPS.

223.    In December, 2009 Benjamin Villejo was required to surrender his passport and later required to sign an agreement to pay $4,000 if he failed to return the passport. Mr. Villejo was maintained on Philippine vacation for eleven (11) months and did not return to the United States until he told IPS that he had another job offer from a different overseas employer.

224.    In or about April, 2009, Ms. Wilson disrupted a meeting of about 100 unemployed IPS workers who were talking to The AIM Group Incorporated about working for AIM. She approached the meeting yelling and screaming at the workers, who scattered in fear that they would be deported by IPS if they stayed and met with AIM.

225.    In or about May-June 2009, Mr. Toups threatened Mr. Mangilimotan with deportation if he continued to complain about being unemployed.

226.    From 2009 through 2010, Karim Ayed was a Vice President of IPS, served as the corporate representative for IPS, and authorized the litigation filed by IPS against AIM to prevent AIM or other E-2 visa qualified companies from hiring *unemployed* IPS workers.

227.    In September, 2009, Nourredine Ayed and Ms. Sarmiento were informed by Mr. Punzalan of the human trafficking conditions at IPS, and promised to "take care of it"; however, the conditions did not change because they fully intended to continue the trafficking and exploitation of Plaintiffs.

228.    Nourredine Ayed and Ms. Sarmiento also misled Mr. Punzalan into paying 50,000

pesos and took his passport promising that IPS would re-employ him in the United States, but refused to fly him back or re-employ him when he did return to the United States.

229.   On or about April 10, 2010, Ms. Mariner, aided and abetted by Ms. Wilson threatened to deport Simeon Domingo if he did not sign a contract to work for IPS.

230.   As a direct and proximate result of Defendants' conduct, Plaintiffs have lost wages, benefits, and have suffered mental anguish for which defendants should be held jointly and severally liable.

231.   Plaintiffs' conduct was intentional, malicious and calculated to deprive Plaintiffs of their rights. Accordingly, Plaintiffs are entitled to exemplary damages.

## UNCONSCIONABILITY AND REQUEST FOR REFORMATION

232.   Plaintiffs reincorporate and reallege each of the above allegations as though fully set out herein.

233.   Plaintiffs were all born in the Republic of the Philippines and were raised speaking one or more of the several languages in the Philippines (e.g. Tagalog, Cebu).

234.   Plaintiffs have, to varying degrees, learned English as a second language but are not fluent in reading English and many of the Plaintiffs have difficulty understanding and speaking English.

235.   Plaintiffs were presented written form agreements well after Nida Sarmiento or others at MBC made oral promises to the effect that, upon payment of placement fees, they would be sent to the United States to work in long-term, or permanent jobs and further promised Plaintiffs that they would be fully employed during the five years that they were in the United States. Many were told that IPS would sponsor workers for green cards.

a.   The written form contracts were not presented to Plaintiffs until after they paid, or made arrangements to pay their non-refundable placement fees.

b. Plaintiffs were not given the contracts until shortly before they were scheduled to fly to the United States and were told that they had to sign the documents to be able to go to their new jobs in the United States.

c. Many of the Plaintiffs were unable to understand the "legalese" of the contracts, did not understand their rights and were, in effect, illiterate and did not read or understand the contract at the time of signing. Most, if not all plaintiffs, did not read anything more than the hourly rate and check the spelling of their name because they were pressured to sign and did not, in any event, understand the English contract.

d. The initial contracts signed in 2006 all stated, in pertinent part, that: "This Agreement shall be construed in accordance with the statutes and legal decisions of Harris County, Texas USA." A copy of an exemplar contract is attached hereto as Exhibit B.

e. As previously stated, IPS has told workers that they cannot leave IPS because their visa belongs to IPS for the five year period of the E-2 visa.

f. In many cases, Plaintiffs were required to sign another contract when they returned to the Philippines on vacation from in or about 2007 through 2010 (the "2007 Contract"). The 2007 form contract was obtained under duress, was written in English, and presented as the Plaintiffs were about to take a plane to return to the United States. The 2007 form contract stated, in pertinent part, that: "This Agreement shall be constructed in accordance with the statute and legal decisions of the Philippine Law." A copy of an exemplar contract is attached hereto as Exhibit C.

g. Plaintiffs were told and/or understood, from the circumstances that if Plaintiffs refused to sign either the 2006 or the 2007 Contract (and later contracts), IPS and MBC would cancel their flight, keep their non-refundable placement fees and continue to hold their passports to keep them from working for other overseas employers.

h. The 2006 Contract states, in pertinent part, "18. Working for other companies: The employee agrees that they shall not, 'moonlight' for other companies while working for IPS and that they shall dedicate their services to IPS." The 2007 Contract amplifies that limitation on Plaintiffs' freedom.

i. Plaintiffs, however, were promised that they would have stable, long term or permanent jobs during the five years that they were in the United States, and were shocked to find that they were placed on long periods of standby and told that if they took jobs elsewhere during periods of unemployment, IPS would have them deported.

j. Plaintiffs accepted a $1,000 allowance from IPS because they needed to support their families and they had no alternative to remaining unemployed and on standby. However, the allowance had to be repaid despite the verbal

and written promise that they would receive "minimum guaranteed salary with or without work."

236. The contracts presented to Plaintiffs in 2006 through 2010 were presented on a take-it-or-leave-it basis, under time pressure, where Plaintiffs, most of whom needed to borrow funds for the non-refundable placement fees, had no bargaining power or a realistic opportunity to bargain with Defendants, and did not want to lose their placement fees or their ability to make a living overseas. Many plaintiffs were told that they either signed contracts when presented in the Philippines, or they would not be allowed to travel to the United States. At the same time, Plaintiffs were told that IPS sponsored or owned their visas; thus, if they wanted to work in the United states, they were led to believe they had to work for IPS. Thus, the 2006 and 2007 Contracts were contracts of adhesion and are also unconscionable as the one-sided contracts were obtained through duress, deception, and overreaching leaving Plaintiffs vulnerable to Defendants' acts of human trafficking.

237 A chart of the contracts in Plaintiffs' possession setting out the dates of execution is attached hereto as Exhibit D.

238. Plaintiffs performed their part of the contracts prior to, and despite the breaches of their contracts and misrepresentations by IPS.

239. Plaintiffs ultimately were forced to escape because of the continuing breaches of contract and exploitation of their services obtained through fraud and misrepresentation.

240. The contracts should be reformed to strike all provisions of the contract except Plaintiffs' minimum base salary, the monthly payment of $1,000 "with or without pay" and that their employment was to last for the five years they were going to work for IPS.

241. Plaintiffs were constructively discharged by IPS and have suffered damages by unemployment, or reduced compensation following their departure from IPS.

242. Plaintiffs are entitled to reasonable costs and attorneys fees incurred in bringing

this action pursuant to Chapter 38 of the Texas Civil Practice & Remedies Code.

# **Breach of Contract**

243.    Plaintiffs reincorporate and reallege each of the above allegations as though fully set out herein.

244.    Plaintiffs each had an oral and/or written contract drafted by IPS and MBC that provided that they would be employed by IPS for up to five years of their E-2 visa status. The written contract was in English and was not provided in Tagalog, their native language. Many of the Plaintiffs did not understand the provisions of the contract. Instead, they relied on the oral representations of Nida Sarmiento.

245.    In pertinent part, the written contracts provided that Plaintiffs would be paid an hourly wage of $18 or $20 per hour. Plaintiffs were to pay a placement fee to MBC.

246.    IPS agreed that Plaintiffs would be paid a "guaranteed minimum salary of $1,000 per month with or without work."

247.    MBC was a joint employer with IPS for all purposes under the law.

248.    Said contracts were performed by each Plaintiff.

249.    Said contracts were breached by IPS and MBC in that IPS did not pay Plaintiffs' wages as promised and withheld and deducted amounts that were not authorized, in writing, to be withheld or deducted by Plaintiffs.

250.    Said contracts were breached by IPS and MBC in that IPS did not pay Defendants' wages upon termination.

251.    Said contracts were breached as IPS and MBC did not have stable, long-term or permanent jobs waiting for Plaintiffs in the United States but used Plaintiffs as cheap labor in a labor pool.

252.    As a result of IPS and MBC's breaches of the agreements, Plaintiffs are entitled to

all amounts withheld without written authorization as damages. Additionally, some Plaintiffs were damaged as a result of IPS delaying payment of their wages for a period of time in excess of one to two months.

253.    Plaintiffs are entitled to reasonable costs and attorneys fees incurred in bringing this action pursuant to Chapter 38 of the Texas Civil Practice & Remedies Code.

## Fraud

254.    Plaintiffs reincorporate and reallege each of the above allegations as though fully set out herein.

255.    Plaintiffs were induced to apply for employment with IPS and pay placement fees to MBC through fraudulent and material verbal representations by MBC, Nida Sarmiento, acting as IPS' agent, as set out above.

256.    Plaintiffs either paid or agreed to pay anywhere from $1200 to $3,000 in placement fees to MBC in consideration for what Nida Sarmiento promised Plaintiffs was a stable, specific, long term or permanent job waiting for them in the United States.

257.    After being induced into entering a verbal contract with IPS and after IPS obtained an E-2 visa, Plaintiffs later signed a form agreement under duress, or through unconscionable business practices with Defendant MBC and IPS, the terms of which are set out in an exemplar contract marked hereto as Exhibit B.

258.    After their arrival in the United States, all Plaintiffs were told that they could not change jobs while in the United States working under an IPS sponsored E-2 visa.

259.    Nida Sarmiento, MBC, and IPS promised Plaintiffs pay at $20 per hour before and at the time of entering the Agreements with IPS. However, either before leaving the Philippines, or upon arrival in the United States, some of the Plaintiffs were told that their pay rate was to be reduced to $18 per hour. At that point, Plaintiffs could not object to the reduction

in their hourly wage.

260.    The oral and written promises made to Plaintiffs were material to their agreement to work for IPS in the United States.

261.    IPS applied to the Consulate of the Republic of the Philippines for issuance of E-2 visas.

262.    As a precondition of obtaining an E-2 visa, Defendants were required to establish that each Plaintiff was "essential", that employers were making request for the workers and that the workers would immediately be assigned a job with a specific company upon arrival for a specific time period ranging for three to nine (9) months.

263.    Thus, Plaintiffs are informed and have good reason to believe that the same kind of representations made to them by Defendants were also made to the United States Embassy in the Republic of the Philippines; that is, they would have specific jobs for specific companies for lengthy periods of time. If IPS failed to make such representations to the Consulate, immigration authorities would have denied issuance (or entry) of foreign workers under E-2 visas.

264.    As set out above, the representations were false and known to be false at the time of their making, or recklessly made without regard to the truth or falsity of the representations as Defendants did not have specific, long-term or permanent jobs waiting and designated for each Plaintiff.  In truth and fact, Defendants always knew and planned that Plaintiffs would be used as part of a general pool labor for jobs that were either available or became available after Plaintiffs arrived in the United States.

265.    As set out above, IPS' representation that Plaintiffs could not change jobs while in the United States on an IPS-sponsored E-2 visa application was false and known to be false, or recklessly made without regard to the truth or falsity of the representation.

266.    In truth and fact, Plaintiffs were entitled to change jobs if they were able to have a

new employer sponsor them on their E-2 visa and file an I-197 Change of Status Form with CSIS.

267.    From in or about mid-2006 through the dates of their respective escape from IPS, IPS fraudulently concealed from Plaintiffs that they had a right to work for another qualified E-2 visa employer despite the fact that Plaintiffs desperately wanted to work and complained about being unemployed by IPS.

268.    The representations made to Plaintiffs were intended to, and did result in Plaintiffs' reasonable reliance upon the representations.

269.    As set out above, Plaintiffs were then subjected to lengthy periods of unemployment, were placed into debt bondage, threatened and harassed if they objected to Defendants' acts of human trafficking and did not make the amount of money that was promised in their contracts.

270.    Defendants' fraud renders portions of IPS' written contracts illegal, against public policy and therefore unenforceable as a matter of law.

271.    As a result of IPS' fraud, each of the Plaintiffs have suffered damages in an amount equal to the loss of their placement fees, lost wages from periods of being unemployed ("benched") during and after the periods of time that they remained in bondage to MBC/IPS and the difference between the amounts promised as hourly wages and the amount actually paid by IPS in the United States.   Plaintiffs are also entitled to lost pay for the life of their visas minus other sources of income during that period of time.

272.    Alternatively, the contract should be reformed to be consistent with the promises made by MBC, Nida Sarmiento and IPS and comport with state and federal laws.

273.    Plaintiffs are entitled to exemplary and/or punitive damages as their actions were undertaken with malice and intent to cause substantial injury to each Plaintiff or with conscious

indifference with to the rights of the Plaintiffs.

274.    Plaintiffs are entitled to damages for mental anguish and distress caused by Defendants' acts.

275.    The contracts should be reformed to strike all provisions of the contract except Plaintiffs' base salary, the $1,000 per month "with or without pay" and reform the contract to provide that the term of the contract last for the five years that Plaintiffs were promised work by IPS.

## Unjust Enrichment

276.    Plaintiffs reincorporate and re-allege each of the above allegations as though fully set out herein.

277.    As a result of the conduct set out above, Defendants have been unjustly enriched.

278.    As a result of the above conduct, Plaintiffs have been damaged in an amount equal to their "standby" time and the ability to support their families.

279.    Defendants are liable for these damages.

280.    Plaintiffs are entitled to exemplary and/or punitive damages as their actions were undertaken with malice and intent to cause substantial injury to each Plaintiff or with conscious indifference with to the rights of the Plaintiffs.

281.    Plaintiffs are entitled to damages for mental anguish and distress caused by Defendants' acts.

## Conversion

282.    Plaintiffs reincorporate and reallege each of the above allegations as though fully set out herein.

283.    As set out above, Plaintiffs were each promised and entitled to jobs in the United States that paid anywhere from $18 per hour or higher plus benefits for the time they were in the

United States.

284.  After being induced to come to the United States on these promises, Defendants placed Plaintiffs in debt bondage and converted funds that should have been paid to them during the periods that they were allowed to work.

285.  Plaintiffs were placed heavily into debt and deprived of the ability to support their families in the Republic of the Philippines.

286.  When Plaintiffs "escaped" from IPS, IPS had a policy of converting and stealing all amounts due and owing to each Plaintiff.

287.  Defendants are liable to Defendants for all amounts converted from Plaintiffs.

288.  Defendants are also liable to Plaintiffs for all amounts taken and converted by Defendants for labor performed by Plaintiffs while in debt bondage, or for amounts that were not paid but should have been paid while Plaintiffs were on "standby" status.

289.  Plaintiffs are entitled to exemplary and/or punitive damages as their actions were undertaken with malice and intent to cause substantial injury to each Plaintiff or with conscious indifference or disregard for the rights of the Plaintiffs.

290.  Plaintiffs are entitled to damages for mental anguish and distress caused by Defendants' acts.

## Texas Theft Liability Act

291.  Plaintiffs reincorporate and reallege each of the above allegations as though fully set out herein.

292.  Defendants knowingly and intentionally took funds that should have been paid to Plaintiffs with the intention of permanently depriving them of the funds. This includes the following funds: (a) placement fees obtained under fraudulent pretenses; (b) amounts taken from Plaintiffs' pay without written authority; (d) all amounts representing the $1,000 per month "with

or without pay" that IPS deducted as "advances"; and (c) unpaid wages. All these amounts were taken from Plaintiffs pursuant to a scheme to defraud plaintiffs by taking their money and services without pay.

293.    The funds were taken without the consent or written authorization by Plaintiffs.

294.    The Texas Theft Liability Act prohibits theft of personal property and services under Texas Penal Code Sections 31.03, 31.04.

295.    A person who commits theft is liable for the damages resulting from the theft.

296.    "Theft" under the Act "means unlawfully appropriating property or unlawfully obtaining services as described by 31.03, 31.03, 31.04, 31.05, 31.06, 31.07, 31.11, 31.12, 31.13, or 31.14, Penal Code."

297.    Plaintiffs are entitled to court costs and reasonable and necessary attorneys fees incurred in bringing this action pursuant to Chapter 134.005(b) of the Texas Civil Practice & Remedies Code.

298.    Plaintiffs are entitled to exemplary and/or punitive damages as their actions were undertaken with malice and intent to cause substantial injury to each Plaintiff or with conscious indifference and disregard for the rights of the Plaintiffs

299.    Plaintiffs are entitled to damages for mental anguish and distress caused by Defendants' acts.

## **Breach of Fiduciary Duty**

300.    Plaintiffs reincorporate and re-allege each of the above allegations as though fully set out herein

301.    IPS, through MBC and Sarmiento recruited Plaintiffs to work for IPS in the United States and agreed to sponsor Plaintiffs as E-2 visa workers pursuant to federal law.

302.    IPS submitted applications to the United States Consul, Republic of the

Philippines representing that it would employ Plaintiffs in the United States at a minimum base salary for specific employers for various time periods for up to five years.

303.    Most Plaintiffs were told that their visa lasted five years and that they would receive stable, long term, if not permanent jobs upon their arrival in the United States.

304.    Plaintiffs did not fluently speak, read and write English and were unsophisticated in relationship to MBC and IPS. Plaintiffs were of limited means and sophistication and relied on MBC, IPS and Nida Sarmiento, to provide them with accurate information regarding traveling from their home in the Philippines to the United States, their employment with IPS and their living conditions in the United States.

305.    Upon arrival in the United States, however, many Plaintiffs were unemployed for weeks, if not months, and were sporadically employed by IPS.

306.    During periods of standby, Plaintiffs lives were controlled by IPS, which required them to live in the Baytown Apartments or another location in Louisiana.

307.    Plaintiffs' mail was controlled and/or opened by IPS, their movements were limited by IPS, they were forbidden visitors in their apartments and were required to stay in their apartments during standby despite the fact that the so-called "allowances" being paid to Plaintiffs were subject to repayment.

308.    During their periods of work, Plaintiffs lives were also controlled by IPS, which provided transportation to and from their jobs, provided housing, and were paid hourly wages while working anywhere up to twelve hours a day.

309.    A special relationship was created between Plaintiffs and IPS based on IPS' sponsorship of their E-2 visas and Defendants' virtually absolute control over their lives,

310.    Texas law imposes a duty to act equitably, in good faith and with due regard for the best interest of an individual to whom a fiduciary duty is owed.

311.    IPS breached its fiduciary duties to Plaintiffs by exploiting Plaintiffs for their own personal gain, misleading them about their rights under the E-2 visa (e.g. failing to disclose their right to work for another E-2 visa qualified employer), the availability and nature of their jobs, their pay and $1,000 monthly payment, failure to disclose the specific details of its promises to the United States Consul, and treated them like prisoners, threatening deportation, limiting their movement, invading their privacy by opening and controlling their mail, entering their apartments at will, and preventing them from obtaining jobs from qualified overseas employers, such as The AIM Group by disrupting its meeting with Plaintiffs.

312.    IPS is liable to Plaintiffs for lost income, mental anguish and is also liable for exemplary damages for its breaches of fiduciary duty. Other defendants aided and abetted IPS in breaching its fiduciary duties and should be held jointly and severally liable with IPS for damages, mental anguish and exemplary damages.

313.    IPS must also account for and pay Plaintiffs any profits made as a result of its breach of fiduciary duty.

## Conspiracy

314.    Plaintiffs reincorporate and re-allege each of the above allegations as though fully set out herein.

315.    Defendants did, from 2006 through the present, conspire, combine and confederate to deceive and defraud Plaintiffs into entering into oral and/or verbal contracts to come to the United States to work for IPS under illegal conditions and to commit acts of fraud, theft, unjust enrichment and conversion as described above.

316.    In furtherance of their conspiracy, members of the Conspiracy committed overt acts as described above.

317.    All Defendants are jointly and severally liable for damages suffered by Plaintiffs.

**Request for Exemplary and/or Punitive Damages**

318.     As to Plaintiffs' Human Trafficking, Fraud, Unjust Enrichment, Conversion, Breach of Fiduciary Duty and Theft Claims, Plaintiffs are entitled to exemplary and/or punitive damages against each Defendant jointly and severally, as their individual and/or collective actions were undertaken with malice and intent to cause substantial injury to each Plaintiff or with conscious indifference to the rights of the Plaintiffs.

## Request for Jury Trial

319.     Plaintiffs hereby request trial by jury on all claims stated above.

320.     WHEREFORE, Plaintiffs request this Court enter judgment in favor of Plaintiffs and against Defendants and specifically provides for:

(a) Entry of judgment awarding Plaintiffs all amounts paid as placement fees, all amounts for unpaid time spent on "standby" when they should have been paid full wages and all wages that should have been paid pursuant to their original contracts.

(b) Awarding all Plaintiffs damages, including compensatory, as well as prejudgment and post-judgment interest in an amount to be determined at trial.

(c) An award of costs and attorneys fees pursuant to 18 U.S.C. § 1964(c), Chapter 38, Texas Civil Practice & Remedies Code and Chapter 34.005, Texas Theft Liability Act, the Human Trafficking statute Chapter 98.001, Civil Practice & Remedies Code, et. seq., and as otherwise authorized by law.

(d) Exemplary and/or Punitive Damages for human trafficking, fraud, conversion, unjust enrichment and acts committed under the Theft

Liability Act, and for conspiracy to commit the same as such acts were undertaken knowingly, intentionally and maliciously with reckless disregard for the rights of the Plaintiffs.

(e) Enter an order of IPS' forfeiture of profits from Plaintiffs' employment.

(f) Enter an injunction restraining each defendant from, directly or indirectly engaging in the same or similar acts of human trafficking; and

(g) Such other relief as may be equitable and just.

Respectfully submitted,

/s/Stephen R.Cochell
Stephen R. Cochell
The Cochell Law Firm
State Bar No. 24044255
Houston Texas 77096
(713)980-8796 (phone)
(713)980-1179 (facsimile)
srcochell@gmail.com

## CERTIFICATE OF SERVICE

This is to certify that, on this 21st day of May, 2012, a copy of this First Amended Complaint was served by ECF and first class mail on:

Kathleen Barrow,
Jackson Lewis
Wedge International Tower, Suite 3325
1425 Louisiana Street
Houston Texas 77002

Gary Jewell
Christian, Smith & Jewell, LLP
2302 Fannin, Suite 500
Houston, Texas 77002

/s/Stephen R.Cochell
Stephen R. Cochell